*95
 
 Ruffin, C. J.
 

 This bill was filed in July 1837, and states that on the 16th of January, 1836, Pate, the intestate of the plaintiff, having occasion to raise money,, applied to the defendant Wright, to borrow the sum of 280, and that the defendant then lent him that sum; and that, to secure the same,- Pate executed to the defendant a bill of sale for a female slave, named Edy, of the age of 16 years,- and then worth nine or ten hundred dollars, and also delivered the slave to Wright, who took her into possession and hath held her ever since. The bill states that notwithstanding the deed was unconditional and absolute on its face, it was not intended by either of the parties to be an absolute sale; but that it was expressly 'agreed between the plaintiff’s intestate and the defendant, that the former might nevertheless redeem the slave. The bill further states that Pate died intestate on the 24th of March,-1836; and-the plaintiff was appointed his administrator, and the prayer is for redemption upon the usual terms.
 

 The answer denies that the defendant lent any sum of money to Pate, or took the conveyance in the bill mentioned, as a mortgage or security for money, or that it was so understood. It states, that at the time specified in the bill two negro boys belonging to Pate, had been seized by the Sheriff on executions and were to be sold on the next day, and that Pate wished to raise money to discharge the debt by borrowing it or by selling, the girl Edy, then about 13 or 14years old, instead-of selling the male slaves at public auction; that the defendant, wishing, to own a girl, agreed with Pate to purchase Edy, and to give for her the sum due on the process then in the sheriff’s hands, supposed- to be about $280; and, as Pate was sick at the time, the defendant agreed to pay the money the next day to the sheriff and have the boys discharged from execution; that thereupon Pate conveyed the girl to the defendant by a deed, absolute in its terms and intended by both parties to be so, and the same day he took her into his possession, carried her to his house, and hath kept- her hitherto. The answer states that the deednvas written by D. M’Colman, and was attested by him and by George Wright and Cameron Wright; ‘¿that the two
 
 *96
 
 latter are since dead, and that, if they were living, the de- fendentcould have proved directly by them that the agreement was for an absolute purchase. It admits that when M’Colman was called on to write the deed, lor he was not present at the bargain, he enquired “how it must be written;” and that Pate replied “nothing but a mortgage.” But the answer avers that the defendant immediately declared that not to be the contract, and that, unless it was to be a sale and purchase, he would have nothing to do with it; and that then Pate directed the draftsman “to write a firm bill of sale absolute in its terms/’ which was done accordingly. The answer further states, that on the next day the defendant went to settle the'demands the Sheriff had against Pate, and found them, instead of $280, to amount to $311, and that he paid the same according to his agreement; and it avers that was.a fair price for the slave Edyat that time,- though in a few months thereafter negro'es róse, and she would have brought more than he gave for her.
 

 The material evidence upon the question, whether the negro was sold or pledged, consists of the depositions of several witnesses taken by the plaintiff. The first is that of D. M’-Colman. He states that the defendant was the nephew of Pate, and possessed' his confidence^ that he, the witness, and Ceorge Wright, since deceased, attested the bill of sale, in which the consideration was expressed
 
 to
 
 be about $280; and that the agreement bfetween the parties was, that Wright should pay the Sheriff certain executions against Pate, which he did the next day, amounting to $311 50; and that Wright was to keep Edy until the money was returned. The witness states that Pate was sick at the time, and died in March following; and that when he executed
 
 the
 
 bill of sale, he said to Wright, that he was not afraid but that he would give up the girl at any time the money should be returned, to which the other replied, “Uncle, if you were dead I would not defraud your children.” This witness also states that Pate was much in debt and for
 

 The other testimony taken before the hearing of the plaintiff relates entirely to the valúe of the slave. One witness, M. M’Colman, states that in? Augustl 836, the other slaves
 
 *97
 
 oí Pate were sold by the present plaintiff as administrator, and that at that sale Edy would have commanded seven or eight hundred dollars. Two other witnesses, Daniel Mallay and Samuel J. Gibson, state that in 1837, she would have sold for six or seven hundred dollars.
 

 In this state the case was brought to hearing at the last term; but it was not decided, because we found a difficulty in coming to a clear conclusion as to the value of the slave Edy — upon which, in our opinion, the decision of the cause mainly depended. It is too late, after the judgment in
 
 Strealtor
 
 v
 
 Jones,
 
 3 Hawks 423, and many cases, which have properly, as we think, followed it, to intimate that an unconditional deed is conclusive of an absolute sale. Facts and circumstances
 
 dehors
 
 may, notwithstanding the form of the instrument, establish its true character to be but a security: such facts and circumstances are enumerated in Mr. Butler’s note, Co, Littleton 205, A. and were acted on in
 
 Streator
 
 v
 
 Jones,
 
 and by ourselves in
 
 Kimborough
 
 v
 
 Smith, 2
 
 Dev. Eq. 558 and other cases. Among those circumstances, inadequacy of price has been often said to be an important one. Not that it will affect an absolute sale of itself, and turn it into a pledge, when it was really designed to be a sale out and out. But when the question is, whether the transaction was a sale or a pledge, the price goes a great way towards satisfying the mind on one side or the other. A gross inadequacy of price. — especially of a species of property in demand, and that generally brings its fair value in open market — argues strongly that security merely was meant or that the supposed vendor was oppressed or imposed on. On the contrary, a fair price and possession simultaneously taken and kept, and no covenant to repay the money advanced have decided several cases, which upon other circumstances were doubtful.
 
 Poindexter
 
 v
 
 M’Cannon
 
 &
 
 Hauser,
 
 1 Dev. Eq. 373;
 
 Munnerlin
 
 v
 
 Birmingham,, 2
 
 Dev. and Bat, Eq. 358.
 
 McDonald
 
 v
 
 M’Leod,
 
 1 Ired. Eq. 221. In this case the value of the slave is distinctly put in issue by the bill and answer; for the defendant not only insists on his absolute deed, as shewing per
 
 se
 
 an absolute purchase, but he sustains it in the point, in which the plaintiff impugns it,-by avering that
 
 *98
 
 his purchase was a -fair one, and for full value. It is true, the subscribing witness contradicts the answer as to the terms the agreement and the nature of the contract; and it is competent to hear and act upon such parol proof, where there has been a mistake or fraud in making the written conveyance different from the original contract. But this witness gives no testimony touching such mistake or fraud. The answer is precise and positive, that, although Pate at first mentioned a mortgage, the defendant refused to accept such a conveyance and required an absolute bill of sale, and that Pate assented thereto, and directed the deed to be so drawn. Now the witness does not contradict any part of that statement; nor in any manner account for his drawing and Pate’s executing a conveyance in this form upon such an agreement as he says-the parties made. Moreover, it is to be inferred from the statement of this witness himself, that the deed was drawn and intended to be absolute; for why, else, should Pate have made the remark,
 
 that he
 
 was not afraid the defendant would take advantage of him? If he had been supposing himself to be executing a mortgage, he would not have thought the other could defraud him. The evidence of. this witness, therefore, cannot autho-rise a decree, for it opposes nothing to the written conveyance, but a previous parol agreement or a declaration at the time,.inconsistent with it. Upon such evidence the Court has never controlled the operation of a deed, imported by its tenor and sustained by the answer; for that would be to allow parol testimony,
 
 simpliciter
 
 to contradict and vary a written instrument,, contrary to the settled rule of the common law and to common sense.
 

 The value of the slave was therefore an important enquiry in the cause. We should have thought, if the value had been satisfactorily shewn to be, as alleged in. the bill, nine or ten, or as stated by the witnesses, eight or seven, or even six hundred dollars, that it afforded cogent proof that a security merely was intended by both parties, or, at least, that the former owner was led to believe that he was giving only a security. For half price, or less than half price for a negro — which, as property, is always saleable — would be so
 
 *99
 
 gross a disproportion to what a seller might have got and probably would have got, had a sale really been in contemplation, as to create a satisfactory presumption that a sale was not meant. But when the evidence on this point was looked into, it raised some surprise to find that every witness, with, probably, as good an opportunity for knowing the value at the time of the conveyance to the defendant, as at subsequent periods, had been examined and answered as to the value, not at the period of the transaction, but at particular days posterior thereto. One witness fixes the value six months, and the two others a year or more after the deed. This was to be observed the more, because the defendant on his oath stated so pointedly, that he gave the full value at the time he bought, tho’ soon afterwards the price of slaves became greater. As there was no direct evidence, except the answer, as to the value on the 16th of February 1836, and it was not satisfactory to take it inferentially from the testimony stated, the Court deferred the decision and directed an enquiry upon the precise point of the value on that day. The master sent down a commission which has been returned with the depositions of four witnesses taken on the part of the plaintiff, and some of them persons who had been examined in chief in the cause. Their evidence the master has reported, with his opinion thereon; from which it appears, that, at the time of the contract, the slave, in the opinion of one of the witnesses, was worth $350, and in that of the other three, $400 — which latter estimate the master adopts; and to which neither party has excepted. That must now be assumed to be the real value of the slave; and, deeming it to be so, it puts a new aspect upon the case decisively adverse to the plaintiff. There can be no positive correctness in setting a value on a slave. One man will give or take fifty or one hundred dollars more or less in the purchase of one than another man will. Therefore the price is not to be too nicely calculated, in reference to this question. We have hitherto said, that to turn an absolute deed into a mortgage the price must be
 
 grossly
 
 inadequate.
 
 McDonald
 
 v
 
 M'-Leod,
 
 1 Ired. Eq. 221.
 
 Leíais
 
 v
 
 Oiven,
 
 Ibid. 290. Here the difference is only such as often occurs in actual sales be
 
 *100
 
 tween the price which a purchaser is willing to give, and that which he would be willing to take, if he were to sell again. The point, to which we are thus brought is fatal to the bill, which must necessarily be dismissed.
 

 Per Quriaji, Bill dismissed.